1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   STORZ MANAGEMENT COMPANY, et          No. 2:18-cv-00068-DJC-DB
     al.,

11                        Plaintiffs,

12          v.                              ORDER

13   ANDREW CAREY, et al.

14                        Defendants.

15

16          Plaintiffs, affiliated businesses that manage, invest in, and sell homes within RV

17   and mobile home parks, have sued their former CEO and CFO alleging they stole

18   confidential information and trade secrets to form competing businesses and solicit

19   Plaintiffs' clients and employees.  Defendants now move for summary judgment as to

20   Plaintiffs' 2nd, 3rd, 6th, 8th, 11th, 12th, 14th, 15th, 16th, 17th, 18th, 19th, 20th, and

21   22nd Causes of Action, arguing Plaintiffs have failed to prove essential elements of

22   these claims and prove damages.  (ECF No. 269.)

23          Having reviewed the Parties' briefings and arguments, the Court agrees as to

24   the 6th, 11th, 12th, and 14th Causes of Action, and will dismiss those claims in full.

25   The Parties have also agreed to dismissal of the 3rd Cause of Action against

26   Defendants Joy Kelly and Nancy Hughes, and to dismissal of the 15th through 20th

27   Causes of Action in full.  The Court declines to grant summary judgment on the

28   remaining causes of action.

**FACTUAL BACKGROUND[1]**

Plaintiffs Storz Management Company ("SMC"), Storz Realty, Inc. ("SRI"), Heritage Funding Corporation ("HFC"), and Heritage Funding IV ("HFIV") are California corporations engaged in various business endeavors within the RV park and mobile home park sector.  (Second Am. Compl. ("SAC") (ECF No. 155) ¶ 22.)  SMC provides RV park and mobile home park management services and invests in mobile home parks.  (*Id.*)  SRI is a licensed real estate broker engaged in individual mobile home purchases and sales.  (*Id.*)  Finally, HFC compiles mobile home park investment packages which it sells to clients, and HFC and HFIV function as the general partners in those transactions.  (*Id.*)  SRI, HFC, and HFIV are affiliates of SMC.  (*Id.*)

Plaintiffs allege that Defendants Andrew Carey, Mark Weiner, Joy Kelly, and Nancy Hughes, all former employees of SMC, stole confidential documents and intellectual property while employed at SMC to create competing companies, Defendants Monolith, LLC ("Monolith") and Monolith Properties, Inc. ("Monolith Properties"), and gain an unfair competitive advantage in the RV and mobile home park marketplace.  (*Id.* ¶ 1.)  Plaintiffs allege that, starting in 2016, Carey and Weiner conspired to illegally copy Plaintiffs' documents, misappropriate Plaintiffs' trade secrets, use Plaintiffs' trademarks, solicit Plaintiffs' clients and employees, and divert corporate opportunities.  (*Id.* ¶ 31.)

At the time of the conspiracy, Carey was SMC's CEO, while Weiner was SMC's CFO and COO.  (Mot. Summ. J. ("MSJ"), Ex. 7 ("Carey Employment Agreement") (ECF No. 269-4); MSJ, Ex. 8 ("Weiner Employment Agreement") (ECF No. 269-4).)  Plaintiffs allege that Carey and Weiner owed fiduciary duties to SMC and its affiliates through their positions as executive officers at SMC, and through their employment agreements in which they agreed to provide executive management services to SMC

---

[1] Defendants have advised the Court they are foregoing a traditional statement of facts in consideration of the Court's time and to comply with the Court's page limitation.  Accordingly, the narrative in this section has been largely drawn from Plaintiffs' Second Amended Complaint (ECF No. 155), as well as pertinent documents in the summary judgment record.

and its affiliates.  (SAC ¶¶ 2, 10–11, 29; Carey Employment Agreement at 1–14; Weiner Employment Agreement at 1–13.)  Plaintiffs also allege that Carey and Weiner signed a "Confidential Information and Invention Assignment Agreement" appended to their employment agreements, in which they agreed not to (1) use or disclose Plaintiffs' confidential business information and trade secrets except for Plaintiffs' benefit, including a prohibition on using such information to solicit Plaintiffs' customers or employees, (2) engage in competing business enterprises, or (3) usurp any business opportunities without first disclosing them to SMC's board of directors, obligations which inured to "the benefit of the Company, its subsidiaries, related companies, affiliates, successors, and assigns."  (SAC ¶ 30; Carey Employment Agreement at 15–19; Weiner Employment Agreement at 13–18.)

During their employment, Plaintiffs allege that Carey and Weiner breached their fiduciary duties by self-dealing and neglecting their duties to SMC and its affiliates in favor of devoting time and resources to Monolith, which Carey and Weiner formed in 2016 to serve as the general partner for their acquisition of Shady Brook, a mobile home park in Oregon.  (SAC ¶¶ 32–34, 36–39, 63; MSJ (ECF No. 269-1) at 7 n.2.)  Plaintiffs further allege that Carey and Weiner consistently used SMC employees, funds, equipment, and other SMC-owned property to benefit Monolith.  (SAC ¶¶ 40–41.)

Plaintiffs also allege that Carey and Weiner used several tactics to mislead and poach Plaintiffs' existing and prospective customers for Monolith.  Plaintiffs allege Carey and Weiner copied SMC's website design for Monolith's website and published an investment circular on behalf of Monolith which referred to SMC as an affiliate of Monolith, featured SMC's name and logo, and discussed Monolith's prospective purchase of two SMC-managed properties.  (*Id.* ¶¶ 42–53.)  As a result of publishing this circular, SMC terminated Carey and Weiner's employment on December 1, 2017.  (*Id.* ¶ 52; MSJ, Ex. 12 ("Carey Termination Letter") (ECF No. 269-4); MSJ, Ex. 13 ("Weiner Termination Letter") (ECF No. 269-4).)

3

1    Following their termination, Plaintiffs allege that Carey and Weiner conspired

2  with now-former SMC employees to remove files from their offices containing

3  Plaintiffs' confidential information, copyrighted documents, and trade secrets.  (SAC

4  ¶¶ 54–56.)  Plaintiffs allege that Carey and Weiner have refused to return those files

5  and have used the information contained therein for their own benefit.  (*Id.* ¶ 57.)

6  Plaintiffs also allege that Carey and Weiner refused to return their company laptops

7  for several weeks, and that Carey and Weiner copied and deleted confidential

8  information and trade secrets contained on the laptops before they were returned.

9  (*Id.* ¶¶ 58–64.)  Plaintiffs allege that on December 4, 2017, Carey implemented a

10  "factory reset" on his company-issued laptop, a function which typically deletes one

11  hundred percent of the data on the laptop's hard drive, while Weiner copied or

12  deleted files on his company-issued laptop on December 10, 2017.  (*Id.* ¶¶ 59–60.)

13  Plaintiffs retained a forensic IT expert to recover data from the laptops once they were

14  returned.  (*Id.* ¶ 61.)  Based on the data recovered, Plaintiffs allege that, excluding

15  Shady Brook,[2] Carey and Weiner pursued several acquisitions of mobile home parks

16  which they failed to disclose despite contractual obligations to do so.  (*Id.* ¶ 63.)

17    Also following their termination, Carey and Weiner incorporated Monolith

18  Properties to provide mobile home park management services.  (MSJ at 7.)  Plaintiffs

19  allege that Carey and Weiner proceeded to solicit many of Plaintiffs' customers, who

20  then migrated from using Plaintiffs' management services to those of Carey and

21  Weiner.  (SAC ¶ 65.)  Plaintiffs also allege that Carey and Weiner convinced SMC's

22  employees Kelly, a property coordinator for SMC, and Hughes, a bookkeeper for

23  SMC, to leave SMC in January 2018 to work for Monolith Properties.  (*Id.* ¶¶ 66–67;

24  Defs.' Statement of Undisputed Facts ("Defs.' SOF") (ECF No. 270-1) ¶¶ 9–11; MSJ, Ex.

25  4 ("Kelly Decl.") (ECF No. 269-4) ¶¶ 2–3, 7; MSJ, Ex. 5 ("Hughes Decl.") (ECF No. 269-4)

26  ¶¶ 2–3, 5.)

27  _____

28  [2] Carey and Weiner bought Shady Brook after disclosing the opportunity to SMC.  (SAC ¶ 63.)

**PROCEDURAL BACKGROUND**

Based on these allegations, Plaintiffs brought this action on January 11, 2018, alleging twenty-two causes of action in their operative Second Amended Complaint for violations of the Defend Trade Secrets Act, 18 U.S.C. 1836, *et seq.* (1st); breach of fiduciary duty (2nd and 3rd); breach of contract (4th, 5th, and 6th); breach of the implied covenant of good faith and fair dealing (7th); intentional interference with contractual relations (8th); fraud (9th and 10th); breach of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* (11th); aiding and abetting the commission of an intentional tort (12th); unfair competition in violation of California Business and Professions Code § 17200, *et seq.* (13th and 14th); trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125 (15th); false advertising in violation of the Lanham Act, 15 U.S.C. § 1125 (16th); copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101, *et seq.* (17th, 18th, and 19th); trademark infringement (20th); unfair competition (21st); and conversion (22nd).  (SAC ¶¶ 76–276.)

Defendants now move for summary judgment as to the 2nd, 3rd, 6th, 8th, 11th, 15th, 16th, 17th, 18th, 19th, 20th, and 22nd Causes of Action against Carey and Weiner; 8th, 15th, 16th, 17th, 18th, 19th, 20th, and 22nd Causes of Action against Monolith and Monolith Properties; and 3rd, 12th, and 14th Causes of Action against Kelly and Hughes.  (MSJ at 5–9.)

The Court held a hearing on June 27, 2024, with Daniel Kohls and Mark Szyntar appearing for Plaintiffs, and James Kachmar appearing for Defendants.  The Court took the matter under submission.

**EVIDENTIARY DISPUTES**

First, the Court will address several evidentiary disputes raised by the Parties in their papers.  Generally, admissibility of evidence at summary judgment is governed by different rules and motivations than at trial.  At summary judgment, Federal Rule of Civil Procedure 56 allows objections to evidence when "the material cited . . . cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

The text of the rule suggests that the focus at summary judgment is on substance, not form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

The party seeking entry of evidence bears the burden of proving that such evidence could be presented in an "admissible" form.  *See Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  If the opposing party objects, the moving party can direct the court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010).  If evidence falls short of "the formalities of Rule 56," a district court may still exercise its discretion "to be somewhat lenient."  *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir. 1993) (collecting cases).

## I.     Plaintiffs' Evidentiary Objections

Plaintiffs object to Exhibits 6 and 11 to Defendants' Motion for Summary Judgment because they are unauthenticated deposition transcripts.  (Pls.' Objs. Defs.' Evid. (ECF No. 270-2) at 2.)  Plaintiffs also object to Exhibits 9 and 10, which are expert reports because they are inadmissible hearsay.  (*Id.*)  Finally, Plaintiffs object to Exhibits 18 and 19 because they are unauthenticated documents.  (*Id.* at 3.)

Plaintiffs' objections to Exhibits 6, 9, 10, and 11 will be overruled.  First, as to Exhibits 6 and 11, Plaintiffs argue that the deposition transcripts do not meet the authentication standards set forth in *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002), under which "[a] deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent."  *Id.* at 774.  Plaintiffs argue the exhibits do not include the reporter's certification.  (*See* MSJ, Ex. 6 ("Deterding Dep.") (ECF No. 269-4); MSJ, Ex. 11 ("Pierini Dep.") (ECF No. 269-5).)  However, Rule 56 was revised in 2010 such that courts must now consider unauthenticated evidence at summary judgment if the

6

1   evidence can be presented in a form that would be admissible at trial.  *See Harlow v.*
2   *Chaffey Cmty. Coll. Dist.*, No. 21-55349, 2022 WL 4077103, at *1 (9th Cir. Sept. 6,
3   2022); *see, e.g.*, *Cottrell v. I.C. Sys., Inc.*, No. 2:21-cv-1167, 2022 WL 17582374, at *1
4   (W.D. Wash. Dec. 12, 2022) (ruling that the 2010 amendments to Rule 56 "superseded
5   the *Orr* holding on which Plaintiff relies" and allowing declaration to be considered
6   where defense counsel stated at oral argument that defendant could call a witness to
7   authenticate the documents at trial if necessary).  In any event, Defendants
8   resubmitted the exhibits with the court reporter's certification.[3]  (*See* MSJ Reply, Ex. A
9   (ECF No. 271-1); MSJ Reply, Ex. B (ECF No. 271-1).)  Thus, Court will consider these
10   deposition transcripts.
11       As to Exhibits 9 and 10, which are reports prepared by Terry Lloyd, Plaintiffs'
12   damages expert, "a district court may consider hearsay evidence submitted in an
13   inadmissible form, so long as the underlying evidence could be provided in an
14   admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam*
15   *Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).  The opinions in Lloyd's reports could
16   be offered by live testimony at trial.  Therefore, they will be considered by the Court.[4]
17       Finally, the Court declines to rule on Plaintiffs' objections to Exhibits 18 and 19
18   as this evidence was not relied on by the Court in disposing of Defendants'
19   arguments.  *See, e.g.*, *Burgess v. Townsend & Townsend & Crew LLP Long Term*
20   *Disability Plan*, No. C 07-05310-JSW, 2008 WL 4531812, at *2 n.1 (N.D. Cal. Oct. 7,
21   2008) ("The Court need not rule on Defendant's evidentiary objections because the
22   Court did not need to consider such evidence in order to resolve the parties' cross-
23   motions for summary judgment.").
24
25   [3] Plaintiffs' objection that these amended exhibits should be considered new evidence, and that they
26   should be granted leave to file a sur-reply, lacks merit.  (*See* Pls.' Objs. Reply Evid. (ECF No. 273) at 1–3.)
    These are substantially the same exhibits previously submitted; the only difference now is that the court
    reporter's certifications are attached.  Plaintiffs' objections are overruled.
27   [4] The Court notes that Plaintiffs' evidentiary objections to these reports are perplexing, not only
    because the reports were prepared by their own expert, but also because Plaintiffs rely on their expert's
28   damages calculations in their briefings.

## II.   Defendants' Evidentiary Objections

Defendants raise various objections to declarations by Mark Szyntar and Peter Deterding relied on by Plaintiffs in their Opposition.  (Defs.' Objs. Pls.' Evid. (ECF No. 271-2).)  However, none of the objected-to evidence is material to the Court's rulings below.  Accordingly, the Court declines to rule on these objections.  *See Williams v. County of San Diego*, 523 F. Supp. 3d 1183, 1193–94 (S.D. Cal. 2021) (courts need not consider evidentiary objections made at summary judgment if they are not "material" to the ruling on the motion).

## LEGAL STANDARD

Summary judgment may be granted when the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The principal purpose of summary judgment is to dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Therefore, the "threshold inquiry" is whether there are any factual issues that could reasonably be resolved for either party, or conversely, whether the facts are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986).  That said, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

In a summary judgment motion, the moving party must inform the court of the basis for the motion and identify the portion of the record which it believes demonstrates the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the moving party meets its initial burden, the burden then shifts to the opposing party, which must establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  To meet their burden, parties must either cite materials in the record supporting their position or show that the materials cited do not establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Courts are not required to comb through the record

1  to find a reason to deny a motion for summary judgment. *Carmen v. S.F. Unified Sch.*
2  *Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).

3        For the opposing party to succeed and avoid summary judgment, they "must
4  do more than simply show that there is some metaphysical doubt as to the material
5  facts*." Matsushita*, 475 U.S. at 586.  Rather, the opposing party must produce enough
6  evidence such that the specific facts set forth by the nonmoving party, coupled with
7  undisputed background or facts, are such that a reasonable jury might return a verdict
8  in their favor. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631
9  (9th Cir. 1987).  In other words, for the moving party to succeed, the court must
10 conclude that no rational trier of fact could find for the opposing party. *Matsushita*,
11 475 U.S. at 587.  Yet to avoid usurping the role of the jury, "[c]redibility
12 determinations, the weighing of the evidence, and the drawing of legitimate
13 inferences from the facts are jury functions," and so the court draws all reasonable
14 inferences and views all evidence in the light most favorable to the opposing party.
15 *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587–88.

16                              **DISCUSSION**

17        Plaintiffs do not oppose Defendants' Motion with respect to the 15th, 16th,
18 17th, 18th, 19th, and 20th Causes of Action.  (Opp'n MSJ (ECF No. 270) at 2.)  They
19 also do not oppose Defendants' Motion with respect to the 3rd Cause of Action
20 against Kelly and Hughes.[5]  (*Id.*)  Accordingly, the Court hereby GRANTS Defendants'
21 Motion as to those claims.

22        The Court will address the remaining 2nd and 3rd Causes of Action against
23 Carey and Weiner, 6th Cause of Action against Carey and Weiner, 8th Cause of Action
24 against Carey, Weiner, Monolith, and Monolith Properties, 11th Cause of Action

25

26 [5] While Plaintiffs state they do not oppose summary judgment as to the 2nd Cause of Action for breach
   of fiduciary duty against Kelly and Hughes, the Court concurs with Defendants that this was likely an
27 error on Plaintiffs' part as the only breach of fiduciary duty claim asserted against Kelly and Hughes is
   the 3rd Cause of Action.  (*See* Reply MSJ (ECF No. 271) at 2.)  Accordingly, the Court will grant
28 summary judgment as to the 3rd Cause of Action against Kelly and Hughes.

against Carey and Weiner, 12th Cause of Action against Kelly and Hughes, 14th Cause of Action against Kelly and Hughes, and 22nd Cause of Action against Carey, Weiner, Monolith, and Monolith Properties below.

**I.      2nd and 3rd Causes of Action for Breach of Fiduciary Duty**

Plaintiffs allege that Carey and Weiner breached their fiduciary duty of loyalty to SMC, as well as to SRI, HFC, and HFIV, by founding Monolith and competing against Plaintiffs using Plaintiffs' trade secrets, employees, and resources.  (SAC ¶¶ 86–102.) Defendants argue that this claim fails against HFC and HFIV because there is no evidence that Carey or Weiner owed them fiduciary duties as Carey and Weiner were never officers of HFC and HFIV, nor did they enter into any agreements with HFC and HFIV that would create a duty on their part.  (MSJ at 10–11.)

The Court will deny summary judgment on these claims.  In California, a fiduciary relationship may be (1) imposed by law or (2) undertaken by agreement. *GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Services, Inc.*, 83 Cal. App. 4th 409, 416 (2000), *disapproved of on other grounds by Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004).  A fiduciary relationship imposed by law is a recognized legal relationship, such as an officer's duty to a corporation.  *Id.* at 419-20.  An officer "who participates in management of the corporation, exercising some discretionary authority, is a fiduciary of the corporation as a matter of law." *Id.* at 421–22.  A fiduciary duty is undertaken by agreement when one person enters into a confidential relationship with another.  *Id.* at 417.  A confidential relationship arises "where a confidence is reposed by one person in the integrity of another, and . . . the party in whom the confidence is reposed . . . voluntarily accepts or assumes to accept the confidence[.]" *Barbara A. v. John G.*, 145 Cal. App. 3d 369, 382 (1983).  A fiduciary duty can exist even in the absence of a relationship defined by law as long as a plaintiff can show an agreement between the fiduciary and the principal where the fiduciary accepts fiduciary responsibilities. *Wolf v. Superior Ct.*, 107 Cal. App. 4th 25, 29 (2003).  The

1   existence of such a relationship founded upon agreement is typically a question of

2   fact.  *Barbara A.*, 145 Cal. App. 3d at 383.

3          Carey and Weiner argue they neither served as officers of HFC and HFIV, nor

4   signed any agreements with them that would create a fiduciary duty on their part.  Yet

5   Carey entered into an employment agreement with SMC in which he agreed, as part

6   of his duties, to "[k]eep the Board of Directors fully informed on the condition of the

7   Company *and affiliates* and on all the important factors influencing them," "[p]rovide

8   general oversight of all Company *and affiliate activities* in conjunction with direction

9   from the Board of Directors," and "[b]e responsible for and oversee the fiscal activities

10  of the Company *and affiliates* including accounting, budgeting, and reporting."

11  (Carey Employment Agreement at 2 (emphases added).)  Similarly, Weiner also

12  signed an employment agreement with SMC in which he agreed to "[e]valuate the

13  Company *and affiliates* and provide input on automating processes and increasing

14  working efficiency," "[u]tilize financial expertise and Certified Public Accountant

15  license to maximize the financial well-being of the Company, the Company Properties,

16  *and affiliates*," "[p]repare and maintain thorough and accurate financial reports and/or

17  forecasts for the Company *and affiliates*, including but not limited to, Company and

18  the Company Properties' assets, budgets, profits, losses, and cash flows," "[d]evelop

19  and maintain monthly operating budget and annual Company *and affiliate* operating

20  budgets," and "[m]anage the financial planning and analysis function for the Company

21  *and affiliate*."  (Weiner Employment Agreement at 2–3 (emphases added).)

22         Based on this, the Court finds there is a genuine question of fact as to whether

23  Carey and Weiner owed fiduciary duties to HFC and HFIV as affiliates of SMC, as their

24  employment agreements indicate SMC and its affiliates entrusted their finances to

25  Carey and Weiner, and Carey and Weiner accepted these positions of trust.  Carey

26  agreed to oversee and take responsibility for the fiscal activities of SMC and its

27  affiliates, while Weiner agreed to manage the financial planning and budgets for SMC

28  and its affiliates.

1    Defendants argue that the Court should grant summary judgment in their favor

2    because the deposition testimony of HFC and HFIV's person most knowledgeable,

3    Peter Deterding, establishes there were no agreements between Carey, Weiner, HFC,

4    and HFIV.  (*See, e.g.*, Deterding Dep. at 31:6–8 ("Q.  Now, are you aware of any

5    contracts between Heritage Funding Corporation and Andy Carey?  A.  No.").)  This

6    testimony simply establishes that there were no direct contracts entered into by Carey

7    or Weiner and HFC or HFIV.  Yet Defendants do not contest the existence or validity of

8    the employment agreements between Plaintiffs and SMC that expressly include

9    affiliates such as HFC or HFIV, nor do they explain how this testimony negates any

10   duties Carey and Weiner might owe based on those employment agreements.

11   Accordingly, the Court finds that the employment agreements create a

12   question of whether Carey and Weiner owed HFC and HFIV fiduciary duties through

13   those agreements and DENIES summary judgment on the 2nd and 3rd Causes of

14   Action as to Carey and Weiner.

15   ## II.    6th Cause of Action for Breach of Contract

16   Plaintiffs allege that Carey and Weiner breached their contractual duties to SRI

17   by pursuing opportunities to buy parks themselves rather than bringing those

18   opportunities to Plaintiffs, thereby failing to provide SRI with additional parks within

19   which it could market pads and homes for sale.  (SAC ¶¶ 22, 119–26.)  Defendants

20   argue this claim fails because neither Carey nor Weiner had such a contractual duty,

21   and SRI has not produced evidence of damages.  (MSJ at 11–12.)

22   The Court will grant summary judgment on this claim.  To prevail on a breach of

23   contract claim, a plaintiff must establish (1) the existence of a contract, (2) defendant's

24   breach, (3) plaintiff's performance or excuse for nonperformance, and (4) resulting

25   damage to the plaintiff.  *Zoom Imaging Sols., Inc. v. Roe*, No. 2:19-cv-01544-WBS-KJN,

26   2022 WL 4025293, at *5 (E.D. Cal. Sept. 2, 2022).

27   First, Carey and Weiner quibble with the scope of their contractual duties to

28   SRI, arguing that neither Carey nor Weiner's employment agreement required them to

provide SRI with additional parks within which it could market pads and homes.  (MSJ at 11.)  Carey and Weiner are correct that their employment agreements did not include those specific terms.  However, in their employment agreements, both Carey and Weiner agreed to disclose any business opportunities to SMC's board of directors before pursuing them themselves.  (Carey Employment Agreement at 15–19; Weiner Employment Agreement at 13–18.)  Further, both Carey and Weiner agreed that these obligations were intended to inure to the benefit of SMC's affiliates, including SRI. (Carey Employment Agreement at 19; Weiner Employment Agreement at 17.)  If, as Plaintiffs allege, Carey and Weiner breached these contractual obligations by pursuing opportunities to acquire parks themselves rather than bringing such opportunities to SMC's board of directors first, they may have deprived SRI of the opportunity to market pads and homes within those parks.  Thus, there is a question of fact as to whether Carey and Weiner breached a contractual duty to SRI.

That said, Plaintiffs do not provide evidence of the damages incurred by SRI because of their inability to market and sell prospective pads and homes.  Rather, Plaintiffs cite generally to the damages report prepared by their expert Lloyd.  In that report, Lloyd concludes that at least three opportunities for acquiring new parks were hidden from Plaintiffs, which, had Plaintiffs acquired those parks, would have generated management fees as well as additional property value to SMC's general partners. (MSJ, Ex. 10 ("Supp. Lloyd Report") (ECF No. 269-4), at 6–7.)  However, Lloyd does not calculate damages *specific to SRI*, i.e., damages based on the prospective sales of individual pads and homes on those three properties.  When the Court raised this point at the hearing, Plaintiffs could not direct the Court to more satisfactory evidence of damages.  Accordingly, Plaintiffs have not shown damages.

Plaintiffs also initially sought injunctive relief for this claim.  (SAC at 52–55.) However, Plaintiffs conceded at the hearing they are no longer interested in seeking injunctive relief this late in the litigation.

The Court GRANTS summary judgment on Plaintiffs' 6th Cause of Action.

### III.    8th Cause of Action for Intentional Interference with Contractual Relations

Plaintiffs allege that Carey, Weiner, Monolith, and Monolith Properties obtained confidential information concerning Plaintiffs' clients and used this information to successfully solicit Plaintiffs' clients to migrate their business to Monolith Properties. (SAC ¶¶ 132–37.)  Defendants argue this claim fails because Plaintiffs have offered no evidence that Defendants used any confidential information to solicit any of Plaintiffs' clients to move their business to Monolith Properties.  (MSJ at 12.)

The Court will deny summary judgment on this claim.  A claim for intentional interference with contractual relations requires (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  *CRST Van Expedited, Inc. v. Werner Enters.*, 479 F.3d 1099, 1105 (9th Cir. 2007).  "Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage, . . . it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself[,]" nor "does [it] require that the actor's primary purpose be disruption of the contract."  *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55–56 (1998), *as modified* (Sept. 23, 1998) (citations omitted).  Rather, a plaintiff need only show "defendant's knowledge that the interference was certain or substantially certain to occur as a result of his or her action."  *Reeves*, 33 Cal. 4th at 1148.

Defendants argue there is no evidence Carey and Weiner used confidential information to solicit Plaintiffs' clients, pointing to the deposition testimony of SMC's person most knowledgeable, James Pierini, who testified that he did not know of any facts indicating either Carey or Weiner used SMC's confidential information to contact or solicit SMC's clients to move their business to Monolith Properties.  (Pierini Dep. at 127:13–142:17, 147:9–149:9.)  However, whether Defendants used confidential

1 information to solicit Plaintiffs' clients is irrelevant to this claim, as California law does

2 not require that a defendant's solicitation be independently wrongful.  Rather,

3 "intentionally interfering with an existing contract is 'a wrong in and of itself[.]'"  *Korea*

4 *Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158 (2003)

5 (quoting *Quelimane*, 19 Cal. 4th at 56).

6         In the deposition testimony cited by Defendants, Pierini testified he spoke to

7 Nick Guerra, the owner of Friendly Village, a client of SMC's, who told him he was

8 being "hounded" by Monolith to move his business from SMC to Monolith Properties.

9 (Pierini Dep. at 128:4–134:4.)  Pierini testified that Defendants were "asking [Guerra]

10 on numerous occasions" and "calling [Guerra] on a regular basis to attempt to get him

11 to move his management from Storz to Monolith," and "in [Guerra's] words were

12 hounding him to make a decision." (*Id.* at 128:15–18, 130:23–24.)  Guerra terminated

13 his contract with SMC in January 2018 after he was "hounded" to move his business to

14 Defendants.  (*Id.* at 128:22–130:7.)  While the Court recognizes this presents only one

15 instance of potential interference, the Court finds that this testimony creates a

16 question of fact as to whether Defendants intentionally interfered with Plaintiffs'

17 contractual relations, as hounding clients to move their business would constitute an

18 intentional act designed to induce a breach of contractual relations.

19         Accordingly, the Court will DENY summary judgment on Plaintiffs' 8th Cause

20 of Action.

21 **IV.    11th Cause of Action for Violation of the Computer Fraud and**

22 **Abuse Act**

23         SMC alleges Carey and Weiner violated the Computer Fraud and Abuse Act

24 ("CFAA"), 18 U.S.C. § 1030, *et seq.*, when they accessed their SMC-owned laptops

25 after their termination without authorization, retrieved and downloaded confidential

26 documents, and deleted documents and data before the laptops were returned to

27 SMC.  (SAC ¶¶ 153–61.)  SMC further alleges Carey and Weiner were aware of their

28 lack of authorization based on their termination letters received December 1, 2017.

1   (*Id.* ¶ 156.)  Carey and Weiner disagree, arguing this claim should be dismissed

2   because there is no evidence SMC explicitly revoked their access to their company

3   laptops after their termination.  (MSJ at 13.)  They also argue SMC has failed to

4   produce evidence of damages.  (*Id.* at 13–14.)

5           The Court will grant summary judgment on this claim.  "The CFAA prohibits a

6   number of different computer crimes, the majority of which involve accessing

7   computers without authorization or in excess of authorization, and then taking

8   specified forbidden actions, ranging from obtaining information to damaging a

9   computer or computer data." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1131 (9th

10  Cir. 2009).  Although the CFAA is primarily a criminal statute, the CFAA also provides

11  that "[a]ny person who suffers damage or loss by reason of a violation of this section

12  may maintain a civil action against the violator to obtain compensatory damages and

13  injunctive relief or other equitable relief."  18 U.S.C. § 1030(g).  In order to bring a civil

14  action, a plaintiff must prove that the defendant violated one of the provisions of 18

15  U.S.C. § 1030(a)(1)–(7), and that the violation involved one of the factors listed in 18

16  U.S.C. § 1030(c)(4)(A)(i).  *Id.*; *Brekka*, 581 F.3d at 1131.  Although each provision has

17  different substantive requirements, there are two threshold requirements for civil

18  liability under any provision of section 1030(a): a defendant must (1) access a

19  protected computer without authorization or exceeding authorization, and (2) the

20  unlawful access must cause either damage or loss.  *Calendar Rsch. LLC v. Stubhub,

21  Inc.*, 2:17-cv-04062-SVW-SS, 2020 WL 4390391, at *15 (C.D. Cal. May 13, 2020).

22          To satisfy the unauthorized access requirement, a plaintiff must show that the

23  defendant "accessed" a "protected computer" "without authorization" or "exceeding

24  authorization."  18 U.S.C. 1030(a).  An "employer gives an employee 'authorization' to

25  access a company computer when the employer gives the employee permission to

26  use it." *Brekka*, 581 F.3d at 1133.  However, "when the employer has rescinded

27  permission to access the computer and the defendant uses the computer anyway," the

28  use is without authorization.  *Id.* at 1135.  Thus, to establish a CFAA claim for

1   unauthorized access of a computer, plaintiffs must establish the employee's access

2   was explicitly revoked.  *See Calendar Rsch. LLC*, 2020 WL 4390391, at *17 (explaining

3   that "a defendant can run afoul of the CFAA when he or she has no permission to

4   access a computer or when such permission has been revoked explicitly").

5          Defendants argue there is no dispute that Carey and Weiner's access to their

6   laptops was never explicitly revoked following their termination.  The Court disagrees.

7   Carey and Weiner were both instructed in their termination letters "to return all

8   property belonging to SMC immediately in accordance with paragraph 3 of the

9   appendix to the [Employment] Agreement."  (Carey Termination Letter at 1; Weiner

10  Termination Letter at 1.)  The paragraph referenced in Carey and Weiner's termination

11  letters governs the return of company property, and provides:

12           I agree that, at the time of leaving the employ of the
13           Company, I will deliver to the Company (and will not keep in
             my possession, recreate or deliver to anyone else) any and
14           all devices, records, data, notes, reports, proposals, lists,
             correspondence, specifications, drawings, blueprints,
15           sketches, materials, equipment, other documents or
16           property, or reproductions of any aforementioned items
             developed by me pursuant to my employment with the
17           Company or otherwise belonging to the Company, its
             successors, or assigns. I agree not to retain any tangible or
18           intangible copies of any Confidential Information of the
             Company or its clients after my termination of employment
19           for any reason.

20

21  (Carey Employment Agreement at 17–18; Weiner Employment Agreement at 16.)  The

22  termination letters also reminded Carey and Weiner of their obligations to protect

23  SMC's confidential information.  (Carey Termination Letter at 1–2; Weiner Termination

24  Letter at 1.)  The Court finds SMC'S admonition for Carey and Weiner to return their

25  laptops immediately, coupled with the language in their employment agreements and

26  termination letters reminding Carey and Weiner of their obligation to protect and turn

27  over copies of SMC's confidential information following their termination, sufficient to

28  create a question of fact as to whether Plaintiffs explicitly revoked Carey and Wiener's

1    access to their laptops and the confidential information therein.  *See, e.g.*, *Astec Am.*

2    *LLC v. Li*, No. 14CV1457-JLS-NLS, 2014 WL 12516024, at *3–4 (S.D. Cal. Nov. 17,

3    2014) (denying motion to dismiss CFAA claim when an employer cut off an

4    employee's access to its server and demanded the employee return the company

5    laptop).

6         That said, Plaintiffs have proved no damage or loss stemming from this claim.

7    As explained above, civil recovery under the CFAA is limited to "[a]ny person who

8    suffers *damage or loss* by reason of a violation of this section . . . ."  18 U.S.C. § 1030(g)

9    (emphasis added).  The CFAA defines "damage" as "any impairment to the integrity or

10   availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).

11   Courts have held that "damage" means actual harm to computers or networks

12   because of a defendant's unauthorized accessed to a protected computer rather than

13   economic harm because of the commercial value of the data itself.  *See NetApp, Inc. v.*

14   *Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 834 (N.D. Cal. 2014) (dismissing plaintiff's

15   CFAA claim because plaintiff failed to allege any damages to the computer system or

16   destruction to any data because of the defendant's unauthorized computer access).

17        The CFAA defines "loss" as "any reasonable cost to any victim, including the

18   cost of responding to an offense, conducting a damage assessment, and restoring the

19   data, program, system, or information to its condition prior to the offense, and any

20   revenue lost, cost incurred, or other consequential damages incurred because of

21   interruption of service."  18 U.S.C. § 1030(e)(11).  However, the  "statute's 'loss'

22   definition–with its references to damage assessments, data restoration, and

23   interruption of service–clearly limits its focus to harms caused by computer intrusions,

24   not general injuries unrelated to the hacking itself."  *See Andrews v. Sirius XM Radio*

25   *Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019); *see also Farmers Ins. Exch. v. Steele Ins.*

26   *Agency, Inc.*, No. 2:13-CV-00784, 2013 WL 3872950, at *21 (E.D. Cal. July 25, 2013)

27   ("Indeed, a number of courts have noted that 'costs not related to computer

28   impairment or computer damages are not compensable under the CFAA.'").

1          Plaintiffs allege that Carey and Weiner's deletion of data from their laptops

2    caused damage and losses to Plaintiffs including the cost of responding to the

3    deletions and lost information, conducting a damage assessment, and attempting to

4    restore the data, as well as lost revenue and other damages incurred because of the

5    interruption of service.  (SAC ¶¶ 160–61.)  As evidence of this, Plaintiffs point to Lloyd's

6    report.  (Opp'n MSJ at 7.)  However, this report does not support the claimed damage

7    and losses as the report does not discuss any impairment to Plaintiffs' computer

8    systems or data, nor does it detail costs associated with conducting a damages

9    assessment and recovering lost data.  (*See* Supp. Lloyd Report.)  The report also does

10   not tie any lost revenue to an interruption in Plaintiffs' computer service as opposed to

11   other losses tied to Defendants' alleged use of Plaintiffs' confidential information.  (*Id.*)

12   Finally, Plaintiffs conceded at the hearing that they could not point to any other

13   evidence of damage or loss cognizable under the CFAA.

14          Accordingly, the Court GRANTS summary judgment in Defendants' favor on

15   Plaintiffs' 11th Cause of Action.

## V.    12th Cause of Action for Aiding and Abetting the Commission of an Intentional Tort

18          Plaintiffs allege that Kelly and Hughes had actual knowledge of Carey and

19   Weiner's fiduciary duties to Plaintiffs, and substantially assisted Carey and Weiner in

20   breaching these duties.  (SAC ¶¶ 162–8.)  Defendants argue this claim must be

21   dismissed because there is no evidence either Kelly or Hughes had actual knowledge

22   of Carey and Weiner's fiduciary duties.  (MSJ at 14.)

23          The Court will grant summary judgment on this claim.  A defendant may be

24   liable for aiding and abetting an intentional tort if the defendant knows the other's

25   conduct constitutes a breach of duty and gives substantial assistance or

26   encouragement to the other to so act.  *McKay v. Hageseth*, No. C-06-1377-MMC,

27   2007 WL 2669934, at *7 (N.D. Cal. Sept. 7, 2007).  "[A]iding-abetting focuses on

28   whether a defendant knowingly gave 'substantial assistance' to someone who

1   performed wrongful conduct, . . . [and] requires a defendant to reach a conscious

2   decision to participate in tortious activity for the purpose of assisting another in

3   performing a wrongful act."  *Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*, 131

4   Cal. App. 4th 802, 823, fn. 10 (2005) (quoting *Howard v. Superior Ct.*, 2 Cal. App. 4th

5   745, 748–49 (1992)).  Thus, "California courts have long held that liability for aiding

6   and abetting depends on proof the defendant had *actual knowledge* of the specific

7   primary wrong the defendant substantially assisted."  *Casey v. U.S. Bank Nat'l Ass'n*,

8   127 Cal. App. 4th 1138, 1145 (2005) (emphasis added).

9        Plaintiffs cite to no evidence in the record establishing Kelly had actual

10  knowledge of Carey and Weiner's fiduciary duties to Plaintiffs.  (*See* Opp'n MSJ at 7.)

11  Accordingly, the Court will grant summary judgment in Kelly's favor on this claim.

12       As to Hughes, Plaintiffs cite excerpts of Hughes's deposition testimony

13  demonstrating she knew that Carey and Weiner were the CEO and CFO of SMC, and

14  that she copied SMC's files on December 15, 2017, while she was still working for

15  SMC, to bring those files over to Monolith Properties when she began working there

16  in January 2018.  (*Id.*; Opp'n MSJ, Ex. B ("Hughes Dep.") (ECF No. 270-4), at 31:9–

17  33:22, 76:23–90:21, 139:3–147:25.)  Her deposition testimony does not establish,

18  however, that Hughes had any understanding as to what duties Carey and Weiner

19  owed to each of the Plaintiffs, or how her actions may have impacted those duties.

20  *See, e.g.*, *IIG Wireless, Inc. v. Yi*, 22 Cal. App. 5th 630, 653 (2018) (holding that, to

21  bring an aiding and abetting claim against the fiancée of plaintiff's former CEO when

22  they formed a competing company in contravention of the former CEO's agreement

23  with plaintiff, plaintiff had to demonstrate the fiancée's actual knowledge of the former

24  CEO's breach of fiduciary duty by starting the new business).  Rather, the evidence

25  suggests Hughes was unaware her actions assisted Carey and Weiner in violating any

26  duties owed to Plaintiffs.  As Hughes attested, "[w]hen a park would terminate its

27  management service agreement with SMC, SMC's practice was to transfer its file

28

1  and/or information about that park to a new property management company, or to

2  the owner if they were electing to 'self-manage' their park."  (Hughes Decl. ¶ 13.)

3       As no evidence establishes that Hughes actually knew or consciously decided

4  to assist Carey and Weiner in breaching their fiduciary duties, the Court will GRANT

5  summary judgment in Defendants' favor on Plaintiffs' 12th Cause of Action.

6  **VI.  14th Cause of Action for Unfair Competition under California**

7  **Business and Professions Code § 17200, *et seq.***

8       Plaintiffs allege that Carey, Weiner, Kelly, and Hughes, while employed by SMC,

9  engaged in unfairly competitive activity by misusing SMC's resources and diverting

10  personnel, funds, and other resources to operation of Monolith and Monolith

11  Properties.  (SAC ¶¶ 176–79.)  Defendants argue this claim should be dismissed

12  against Kelly and Hughes because Plaintiffs have offered no evidence that either Kelly

13  or Hughes diverted personnel, funds, or other resources to operate Monolith or

14  Monolith Properties, nor have they shown damages.  (MSJ at 15.)

15       Plaintiffs do not dispute that Kelly is entitled to summary judgment on this

16  claim.  (*See* Opp'n MSJ at 7–8; Defs.' SOF ¶¶ 27, 29, 31.)  According, judgment is

17  granted in her favor.

18       The Court will also grant summary judgment as to Hughes.  California's

19  statutory unfair competition law ("UCL") prohibits "any unlawful, unfair or fraudulent

20  business act or practice and unfair, deceptive, untrue or misleading advertising and

21  any act prohibited by [the false advertising law (§ 17500 et seq.)]."  Cal. Bus. & Prof.

22  Code § 17200.  Plaintiffs argue that Hughes's deposition testimony establishes she

23  made unauthorized copies of SMC's confidential and trade secret information stored

24  on SMC's drive on December 15, 2017, to bring such information with her to Monolith

25  Properties when she began working there on January 15, 2018.  (Opp'n MSJ at 8;

26  Hughes Dep. at 141:4–147:25.)  This, they argue, "is the essence of Unfair

27  Competition."  (Opp'n MSJ at 8.)  Plaintiffs also argue that Hughes directly assisted

28  Monolith with their bookkeeping while employed at SMC and diverted SMC funds to

1   pay for Monolith's fees.  (Pls.' Resp. Defs.' SOF (ECF No. 270-1) ¶¶ 26, 28.)  In reply,

2   Defendants do not rebut Plaintiffs' argument that Hughes may have misappropriated

3   confidential and trade secret information from SMC.  Instead, they argue Hughes's

4   testimony does not show she diverted any funds from SMC to Monolith while

5   employed at SMC.  (Reply MSJ (ECF No. 271) at 10.)  They also argue that Hughes

6   understood her job duties at SMC as performing bookkeeping for clients of SMC,

7   which included Monolith as the general partner for Shady Brook.  (*Id.*)

8         Taking the misappropriation of funds theory first, the Court finds that Hughes's

9   deposition testimony does not show she diverted funds from SMC, as her testimony

10  establishes she used funds from Monolith's account for pay for Monolith's fees.

11  (Hughes Dep. at 79:22–80:11.)  In addition, while Hughes's testimony establishes she

12  performed bookkeeping for Monolith while employed for SMC (*id.* at 75:1-83:25), she

13  attests that:

14  
15        During my employment with SMC, it was not uncommon for
    me to be asked to provide bookkeeping services for entities
16        owned or controlled by Mr. Maxey and/or Jeff Hunter,
    another SMC director/trustee, with regard to mobile home
17        parks they had interests in for their own benefit.  Given that
    Shady Brook Mobile Home Park was under a management
18        contract with SMC, I did not find it unusual or concerning to
    be asked to perform various tasks for Monolith, LLC, its
19        general partner, such as issuing checks, confirming wire
    transfers or performing similar bookkeeping services.
20  

21  (Hughes Decl. ¶ 7.)  Thus, based on the testimony before the Court, it appears these

22  bookkeeping functions for other entities were within the scope of Hughes's

23  employment with SMC, a fact which Plaintiffs have not rebutted.[6]

24        Defendants do not dispute Plaintiffs' claim that Hughes misappropriated SMC's

25  confidential information and trade secrets to benefit Monolith and Monolith

26  Properties.  (Reply MSJ at 10.)  Claims that an employee misappropriated confidential

27  or trade secret information can support a UCL claim, although such claims are often

28  _____

[6] In addition, Plaintiffs have failed to show damages under this theory.

1    preempted under the California Uniform Trade Secrets Act ("CUTSA") which implicitly

2    preempts alternative civil remedies based on trade secret misappropriation.  *K.C.*

3    *Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 954

4    (2009); *see also Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 986–87 (C.D. Cal.

5    2011) ("[CUTSA] supersedes claims based on the misappropriation of confidential

6    information, whether or not that information meets the statutory definition of trade

7    secret.").  That said, "[C]UTSA does not displace noncontract claims that, although

8    related to a trade secret misappropriation, are independent and based on facts

9    distinct from the facts that support the misappropriation claim." *Angelica Textile*

10   *Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 506 (2013); *see also Leatt Corp. v. Innovative*

11   *Safety Tech., LLC*, No. 09-CV-1301-IEG-POR, 2010 WL 2803947, at *6 (S.D. Cal. July

12   15, 2010) (finding that a UCL claim was not preempted when it involved, but was not

13   limited to, misappropriation of trade secrets).  Defendants have not argued that

14   Plaintiffs' claims would be preempted.

15          However, Plaintiffs have not shown damages.  Plaintiffs seek disgorgement of

16   "all profits [Defendants] earned through the unfairly competitive activities of Monolith"

17   as well as injunctive relief.  (SAC ¶ 180.)  It is undisputed that Hughes has no profits

18   that would be subject to disgorgement, and Plaintiffs represented at the hearing they

19   do not seek to recover Hughes's salary earned from Monolith Properties.  Rather,

20   Plaintiffs argued at the hearing they are seeking profits earned by other Defendants

21   which are traceable to Hughes's unfairly competitive actions, i.e., bringing SMC's

22   confidential data and trade secrets to Monolith Properties to solicit SMC's clients.

23          However, the profits Plaintiffs seek are not recoverable under the UCL.  In *Korea*

24   *Supply Co.*, the California Supreme Court addressed "whether disgorgement of

25   profits allegedly obtained by means of an unfair business practice is an authorized

26   remedy under the UCL where these profits are neither money taken from a plaintiff

27   nor funds in which the plaintiff has an ownership interest," and held that

28   "disgorgement of such profits is not an authorized remedy in an individual action

1    under the UCL." *Korea Supply Co.*, 29 Cal. 4th at 1140, 1144-50.  Thus, only

2    restitutionary disgorgement, which focuses on the plaintiff's loss, may be recovered

3    under the UCL; nonrestitutionary disgorgement, which focuses on the defendant's

4    unjust enrichment, is not.  *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176,

5    1184 (S.D. Cal. 2012); *Meister v. Mensinger*, 230 Cal. App. 4th 381, 398 (2014).  In

6    other words, a UCL plaintiff can only obtain disgorgement of profits if he gave the

7    defendant the profits or has an ownership interest in them.  Plaintiffs seek Defendants'

8    profits associated with the unauthorized use of their confidential information and

9    trade secrets to solicit their clients.  Thus, they do not seek to recover profits they

10   themselves gave Defendants, nor do they claim any ownership interest in Defendants'

11   profits.  Rather, the profits they seek sound in unjust enrichment, which are not the

12   proper subject of this UCL claim.

13          Defendants also argue that Hughes does not currently engage in anti-

14   competitive behavior that need be enjoined.  (MSJ at 15.)  Plaintiffs did not contest

15   this in their papers or at the hearing.

16          Accordingly, the Court GRANTS summary judgment on Plaintiffs' 14th Cause of

17   Action as to Kelly and Hughes.

18   **VII.   22nd Cause of Action for Conversion**

19          Plaintiffs allege that Carey, Weiner, Monolith, and Monolith Properties

20   intentionally and substantially interfered with SMC's property by taking SMC's

21   confidential documents and data without permission and using the stolen assets to

22   gain an unfair competitive advantage in the marketplace.  (SAC ¶¶ 271–76.)

23   Defendants argue this claim fails because SMC has not provided evidence of the value

24   of the documents and data at the time of the taking.  (MSJ at 18.)

25          The Court will deny summary judgment on this claim.  The elements of a

26   conversion claim under California law are (1) the plaintiff's ownership or right to

27   possession of the property; (2) the defendant's conversion by a wrongful act or

28   disposition of property rights; and (3) damages.  *Lee v. Hanley*, 61 Cal. 4th 1225, 1240

1    (2015).  Damages typically consist of the value of the property at the time of the

2    conversion but may also consist of lost profits associated with the conversion.  *See* Cal.

3    Civ. Code § 3336 (presumptive measure of damages for conversion based on "value

4    of the property at the time of the conversion . . . or, an amount sufficient to indemnify

5    the party injured for the loss which is the natural, reasonable and proximate result of

6    the wrongful act complained of and which a proper degree of prudence on his part

7    would not have averted"); *see, e.g.*, *Combs v. Doe*, No. C10–01120-HRL, 2011 WL

8    738052, at *2 (N.D. Cal. Feb. 23, 2011) (lost profits associated with conversion of

9    website and domain name properly included in damages calculation).  However,

10   California courts have explained that "[a]s a general rule, the value of the converted

11   property is the appropriate measure of damages, and resort to the alternative occurs

12   only where a determination of damages on the basis of value would be manifestly

13   unjust."  *Lueter v. State of California*, 94 Cal. App. 4th 1285, 1302 (2002); *Myers v.*

14   *Stephens*, 233 Cal. App. 2d 104, 116–19 (1965) (affirming trial court's award of lost

15   profits as damages for conversion claim when special circumstances dictated lost

16   profits were the better measure of damages).

17           Plaintiffs' expert Lloyd does not calculate the value of the documents and data

18   at the time of the conversion.  He does, however, opine on Plaintiffs' lost income

19   resulting, in part, from Defendants' alleged use of Plaintiffs' confidential documents

20   and data to solicit Plaintiffs' clients for themselves.  This includes lost monthly park

21   management fees due to Plaintiffs' former clients terminating their business with

22   Plaintiffs in favor of Defendants.  (*See* Supp. Lloyd Report at 4–5.)  Defendants have

23   not shown why lost profits as a measure of damages would be inappropriate here.

24   Thus, the Court finds that Lloyd's report raises a genuine issue of material fact as to

25   the extent of SMC's lost profits as a potential measure of damages.

26           Accordingly, summary judgment on Plaintiffs' 22nd Cause of Action is DENIED.

27   ////

28   ////

1

**CONCLUSION**

In accordance with the above, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (ECF No. 269) is GRANTED in part and DENIED in part.  The Court will:

1.  Grant summary judgment on Plaintiffs' 3rd Cause of Action as to Kelly and Hughes; 6th Cause of Action; 11th Cause of Action; 12th Cause of Action; 14th Cause of Action; 15th Cause of Action; 16th Cause of Action; 17th Cause of Action; 18th Cause of Action; 19th Cause of Action; and 20th Cause of Action.

2.  Deny summary judgment on Plaintiffs' 2nd Cause of Action; 3rd Cause of Action as to Carey and Weiner; 8th Cause of Action; and 22nd Cause of Action.

IT IS SO ORDERED.

Dated:   **July 12, 2024**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC4 – storz18cv68.MSJ

26